410-0956 Tripp R Development v. Golfview Apartments Mr. Friedman, you are here, sir. Yes, I am. And from the affiliate, Jeffrey Tak. Okay. Mr. Friedman, you may proceed. May it please the Court, Mr. Tak. Counsel. This is a dispute that arises out of a failed condition precedent in a real estate contract. It's a dispute about the disposition of the earnest money deposit when the deal didn't close. My client, Golfview Apartments, the appellant, defendant, was the purchaser of a large rental apartment complex in Rantoul, Illinois, under this contract and deposited $230,000. Mr. Friedman, what was the condition precedent that was not established? And that was the heart of this dispute, which is section 10F3 of the contract on page 22 of the record. And it says that the buyer will not be obligated to consummate the transaction unless and until, number three, the buyer has determined its eligibility to receive tax credits for the premises. What does that mean? That means that it was in the buyer's determination that it did not receive the tax credits that it felt were necessary to close and finance the transaction. Okay, I want to ask you a question. I think the other side argues that Golfview needed to determine their eligibility to receive tax credits. And that process is, do I have enough low-income housing units in this development to qualify for tax credits? And that it doesn't mean, did I win the competition to be able to get the tax credits? Well, yeah, I understand that argument. And apparently what the other side is saying is if you satisfy a portion of this very complex statute, that makes you eligible. If you have the correct number of apartments or the correct income characteristics of the renters. That's only a small portion of that very complex statute, which says there are many other requirements, various timing issues, and importantly, award of tax credits, the very limited tax credits by the Illinois Housing Development Agency. But you didn't say, the contract doesn't say I get my deposit back if I'm not awarded the tax credits. It says if I determine eligibility for tax credits or fail to determine eligibility for tax credits, I get my money back. And that's a contradictory argument that they made that I don't understand. And that is, let's say that the tax credits were not awarded and the record isn't clear on that. If the tax credits are not awarded and other eligibility characteristics are there, does that say that my client considers itself eligible and has to complete the transaction? Mr. Freeman, I don't understand this argument. This is a $22 million transaction where we have, one would assume, lawyers involved on both sides drafting up this contract. 10F3 says the buyer would not be obligated to consummate the transaction unless and until the buyer has determined its eligibility to receive tax credits for the premises. That's it. Now, it seems to me if you meant something else or if the buyer had something else in mind or whatever, phrase it differently. But, you know, I'm kind of a literal sort of guy. And it says buyer has determined its eligibility to receive tax credits for the premises. So my question is, did the buyer determine its eligibility to receive tax credits for the premises? That's a yes or no answer, isn't it? And I agree with that 100%. Okay, and what was the answer to the question? The answer is no, it did not. Okay. And looking at the evidence that was presented on summary judgment, looking at the... What is the evidence on the question of whether the buyer has determined its eligibility to receive tax credits for the premises? Absolutely. What is that evidence? That evidence... Who said, no, we haven't? Mr. Vince Lane, in his affidavit, says precisely that, Your Honor. Where does it say that in Lane's affidavit? Give me the section of it. And that is on C-59 of the record, the second page of the affidavit. First page he describes his role on behalf of the purchaser. And then he says, the purchase was conditioned upon the defendant, which is Gulfview, obtaining tax-exempt bond and credit financing, which was codified, and here's the precise recital, in the recital section and precisely section 10F3 of the agreement. And then the next paragraph he says, I attest that notwithstanding its good faith efforts to do so, defendant was unable to secure the financing upon which the obligation to close was conditioned. Counsel, 10F3 says, buyer has determined its eligibility to receive tax credits for the premises. Where does Mr. Lane, in his affidavit, say yes or no to that? He says in paragraph 6 of the affidavit, he refers specifically to the condition to close. I know he refers, but what I want to see is where are the words that appear, we were not able to determine our eligibility to receive tax credits for the premises. He doesn't say it in that precise. Well, where does he say it in anything like that? He says it. What does he say? He says he refers to 10F3 and then he says that the defendant was unable to receive that financing upon which was a condition to closing. So he's got two sentences. One sentence refers to 10F3 and the second says that condition was not. Well, it seems to me if this is the basis of the argument that the defendants are making, that we were not able to determine our eligibility to receive tax credits for the premises and therefore the contract is not sound, that you can have Mr. Lane say that. Why didn't he say it? Well, I don't know the answer to that question. We just have the record in front of us, Your Honor, and I think it's pretty clear from his affidavit. Now, let me ask it this way. This is an affirmative defense you're raising to them, is it not? It is an affirmative defense. Okay. So that means it's your burden to establish this? That is correct. And all you have is Mr. Lane's affidavit, which appears to me to be his editorial comment that we did our best to comply with 10F3 and couldn't. And what more can you say? He is the representative. What more can you say? You said in the contract it followed up, but it didn't. But as the finance representative for the purchaser, he says this was a condition. We recognize it. We did not get our financing. No one cares in 10F3 whether you got your financing. Absolutely cares. Now it says buyer has determined its eligibility to receive tax credits for the premises. Now, I grant that this is strange and unusual, and I don't see the purpose of it, but that's what your contract says. And it accorded the essentially very broad discretion to the purchaser to make that determination. Where does that appear? In what action? Well, actually. How can it be broader than that? It's a yes or no question, isn't it? Buyer has determined its eligibility to receive tax credits. You have or you haven't. And there's no notice required. There's no nothing required. All is required. And the parties agreed on this language that the buyer would make that determination. And the buyer, if the buyer doesn't have its financing, it obviously, whether it determines it or not, it obviously cannot go ahead. That's a conditioned precedent. The tax credits are a deal couldn't go forward, couldn't be financed unless they get tax credits. Are you asking that the closing be delayed, or are you asking that you get your deposit? Actually, and that's what the section 10 says. Yes, the deposit should be returned. See, I don't read it that way. It says buyer will not be obligated to consummate the transaction unless and until the buyer has determined its eligibility. It sounds like you get to put off the closing if you want to. Well, if you read farther down in the contract, it says if any of the requirements are not satisfied, the agreement is on page C-22, the last paragraph. Then it automatically terminates at the closing date? And on the earnest money together, all else shall be returned to the buyer. Except for such obligations as expressly survive termination under this agreement. If you look back at the deposit language in paragraph 5, it says, you know, you get a 30-day due diligence period, but after that time has expired, the money is never going to be refunded to the buyer unless there's a breach on the part of the seller. That argument was not made. Oh, come on. I'm sorry, there was a contract except what you argued in the trial court? No, Your Honor, but what I'm saying is that the argument was made in the trial court. I misspoke. It was made in the trial court. The judge declined to rule on that. I argued that made that argument in my appellant's brief, and the appellee did not respond to that. You may be arguing, I do not understand how you can, here you have a real estate purchase agreement. There's a deposit put down. The deal does not go forward. How do you get your deposit back? What's the sense of having a deposit? Well, I don't know what the answer to that is, except this is what the parties did agree to. The sense of the deposit is if there was a default and the buyer did not do everything that was required and then closed, if there's a default, then clearly the deposit would go to the seller. That's not what occurred here because this is a condition that was agreed to by the parties. Wait, wait, wait. What condition is agreed to? The tax credit financing in 10-F-3 was agreed to by the parties. It doesn't say you determine your eligibility to receive in your favor. It says you've determined it. If you're still adding up the numbers, I can see that's one thing. But the fact that you have, you don't like going forward with the deal doesn't seem to me to justify you getting your deposit back. What I tried to show in our briefs is that tax credit financing for these kinds of housing arrangements are absolutely essential. Then why doesn't the contract say so? If that's what the parties intended to say, we're going to determine our eligibility to receive tax credits for the premises, and if favorable, then the deal will go through. That's what you're arguing, isn't it? It seems to me that's implicit in determining its eligibility. It couldn't be whether it determines negatively or positively. It still goes through. That's clearly not what the parties intended. That's not what it says. You mean this $22 million deal, we're going to assume that the eligibility result was favorable even though the language doesn't say that? It's a $22 million deal, which is not a financeable or a profitable deal without tax credits. This is what the contract calls for, and 10F3 doesn't mean what it says. We should assume that it has a favorable outcome for the buyer. In other words, you're saying it reads as if buyers determined its eligibility to receive tax credits for the premises, and it was favorable. Those are the words you're saying we have to read into it. I certainly could not agree that that sentence means if the buyer determines that it is ineligible, then the deal will go forward. Clearly it doesn't mean that. That doesn't make any sense. The deal can only go forward. So we have to amend the contract to add the words that you're going to have a favorable outcome. I don't think Mr. Tock is going to disagree. He can tell you himself that that means if it is, in broad sense, the deal is not eligible. Well, his argument is determine your eligibility. You didn't say anything about favorable there. Is any right? Well, he has, as I understand Mr. Tock's argument, and again, he can explain it, he says that we did not prove that we made that determination. Not whether it was negative or positive. So I don't think anybody can read that language, and I don't think he's arguing for that language that it isn't whether it's negative. Let me back up the procedure. They filed a motion for summary judgment saying they had this contract, and they didn't deliver the good. They didn't come up with it. We want the earnest money. We want the down payment, whatever you call it. They'd be correct unless you're able to establish this affirmative defense. Isn't that right? No, that's not correct. I don't agree with that because they were the movement for summary judgment, and the burden is on them to show that there's no controverted evidence showing that we had not made that determination. Counsel, listen to my question. Sorry. Had you just said, had you asserted no affirmative defense, they'd be right, wouldn't they? Had their motion for summary judgment? I don't think so because they did not submit any sufficient uncontroverted evidence on the issue of whether or not that determination had been made. The determination set forth in your affirmative defense? Yes, that's correct. So my question, though, is leaving aside your affirmative defense, had you not made it, wouldn't they prevail on their motion for summary judgment? No, they would have to show that all of the elements had been satisfied, that they had furnished all their elements, and we don't disagree with that at this point, and that we had defaulted. Why don't they just have to show that there was no closing? Contract requires a closing, what, within 150 days? No closing happened. No, they have to show a default on the part of the purchaser in order to get that back. Well, you defaulted, you didn't pay. But you're saying we don't have to because of our affirmative defense. Okay, go ahead and answer that question. I want to ask you something. Well, it seems to me that they've got to show that there was a default that was not justified by the contract. In the recitals, the contract says, seller understands that buyer intends to finance the acquisition and construction of the premises through the use of tax-exempt bonds and tax-exempt bond credit enhancement financing. Now, is that financing different than the tax credits that are referred to in 10-F-3? I don't think it's well expressed, but I think that refers to IDA and it refers to tax credits. It is not well expressed, but the tax credits are not the same as bond financing. So I think it does speak to the question of tax credits, yes. Okay, now, I didn't understand your answer. What I'm trying to get at is, is the recital referring to types of financing that include this tax credit financing referred to in 10-F-3? The answer is yes. The answer is yes? Yes. How does a buyer determine its eligibility for tax credit financing? I suppose there's many ways of doing that. One way is to look at the federal statute and determine whether the characteristics of the rental community meets those requirements. The other is… Isn't there an application process that you go through? There's a very complicated application process that needs to be submitted to IDA, and there's many, many steps involved, many, many forms that are involved. And your project may or may not be accepted, even if you have sufficient numbers of low-income renters. That's correct. There's many, many requirements to find yourself eligible to receive those credits. But there's competition for those dollars, those tax credit dollars, other projects out there that are competing for the same tax credit. There's a limited number that can be awarded, correct. So I'm just trying to understand how this process works. Do you have to get to the end of the application process and actually get an award of the tax credits before you feel you would have had to go through with this contract? Not necessarily. There's many places where that could have stopped. If the rental population did not meet the requirements, if the timing requirements were insufficient, if the federal allocation was insufficient, if IDA said the federal allocation was insufficient, if IDA considered the application and awarded it to somebody else, there's many ways along that path where the eligibility could have ceased. The issue before us is whether there's a genuine issue of material fact in whether the plaintiffs are entitled to summary judgment as a matter of law. Absent your affirmative defense, you didn't close, and I think they would clearly be entitled to it. So now the question is, what about that affirmative defense? It seems to me that the sole issue here, then, is, is there a genuine issue of material fact with regard to the affirmative defense you raised, namely the determination under 10F3. What evidence is there to show that there's a genuine issue of material fact as to whether or not this determination was made? Well, we think there isn't in the sense that we think that affidavit does specifically show that that affirmative defense was closed. Other than the Lane affidavit? Other than the Lane affidavit. The affidavit that you just cited, that we talked about earlier, do you have anything in this record to show that there's a genuine issue of material fact concerning the affirmative defense that you raised regarding 10F3? Yes, clearly the evidence that the RRR submitted to the court, and that is some pages out of an appraisal which they have interpreted. It doesn't say that the determination took place. It talks about performance. It talks about the sale of tax credits, but it does not say. I'm not sure I understand your answer. They submitted something that shows what pertaining to 10F3. The seller submitted an affidavit from one of its officers attaching eight pages from an appraisal by whatever appraiser, which had a calculation of the sale value and tax credit value of the property, and that they've interpreted that appraiser's valuation as an indication that there is an admission, I guess, of there being a determination of eligibility. Well, that's an argument against your position they're claiming, whatever evidentiary value that strange affidavit might have. But I'm asking you, what is there in this record which supports a conclusion that there would be a genuine issue of material fact that buyer has determined its eligibility to receive tax credits for the premises? There's just two pieces of evidence in addition to the contract. The first is the Ghent's Lane affidavit, and the second is the Nudo affidavit with the appraisal. That's it. That's in the record. So if we conclude that neither of those gets the job done, you lose? I don't think so. I think that you have an issue, not that we may lose on our motion for summary judgment. We have a controversial issue of fact. Okay. Thank you, Counsel. You have a chance to address this again in rebuttal. Okay. Thank you, Your Honor. Mr. Tonk? May it please the Court? Counsel. I agree. Mr. Tonk, I've never seen an affidavit like the one that's submitted in support of summary judgment. All I can say is it's a good thing that the strength of your case doesn't depend upon that. I don't see how it can meet the standards under Rule 191A. Which affidavit, Mr. Lane? The Nudo affidavit. The Nudo affidavit. Well, the purpose of the Nudo affidavit, if I can back up a moment, the history of this case was that I had filed the complaint, entry of appearance by Gulfview, given 30 days to file a response. No response filed. I filed just a general motion for summary judgment on the pleadings. Then I get the response of pleadings, and now I'm kind of trying to do something more than just judgment on the pleadings for not a response and trying to salvage a summary judgment. So I apologize for perhaps the form of Mr. Nudo's affidavit. However, I believe that Mr. Nudo's, excuse me. I don't see how Nudo's affidavit establishes anything that helps you. Tell me how it does. I believe that it helps because it submitted to the court the appraisal that Mr. Nudo received from Mr. Lane, who was the agent of Gulfview. Who didn't do the appraisal. Lane did not do the appraisal. Neither did Nudo. But you've got a portion of that appraisal attached to Nudo's affidavit. And I think that that would be subject to an objection raised by Gulfview, saying that there is an improper foundation for it. They didn't move to strike the affidavit? They did not move to strike the affidavit. And they admitted that the portion of the appraisal was based upon a pro forma that had been submitted by the defendant, Gulfview, to appraisal research, and that was the basis for the appraisal. Even with that. Okay, let's say they didn't object, and so the trial court could consider it if they chose to. How does that establish that they were eligible? It says right in the appraisal that they assumed eligibility. They didn't determine it independently in the appraisal. The way that I interpreted that situation is that there was a reference in the appraisal, that's C-91, excuse me, wrong page. At C-86 it says, we have made no independent verification of the eligible basis provided. We assume the basis quoted to be correct. And that was a basis that was submitted to them by Gulfview. So Gulfview is submitting this information to this appraisal company for the preparation of an appraisal. Now on page C-87, it states reportedly a sale of the tax credits is being negotiated with Century Pacific. The price has not been finalized. However, it was estimated at $9,073,521, or 90 cents per tax credit dollar, by the developer. This is slightly below the survey data. I find it incredible that somebody would have an appraisal prepared, negotiate the sale of $9 million in tax credits, and then say, oh, this is just all based on funny numbers. We really haven't made a determination yet as to whether or not we're eligible, let alone whether or not we're actually going to receive the tax credits. I think that under the IDA rules that any person, Gulfview, anybody else, can make a determination of eligibility based upon the written criteria. If you have a certain number of low-income personnel, if your community has a certain number of low-income people, those are the sorts of things that IDA looks for in determining who is going to receive the actual tax credits. If Mr. Topp, $9 million of this deal was supposed to come from tax credits that were going to be sold. Yes. Why would a buyer ever agree to bind themselves on a deal unless and until they knew they could place those tax credits? I think that Gulfview had made a determination that they felt very comfortable with the eligibility of this project and had pursued Century Pacific to purchase those tax credits and had that lined up in advance in anticipation of receiving approval from IDA. Okay. You think that seems to me that... Well, I agree. That's my interpretation of this information that's in these eight pages of the appraisal. Have you done these types of deals before? Are you familiar with this whole tax credit financing niche? No. Because I'm wondering if these are terms of art maybe that the lawyers involved in this deal just... I don't know if they... Did you help draft the contract originally? I had reviewed the contract. The contract had been drafted by Gulfview and submitted to RRR, my client. How many pages was it? The contract itself? Yes. How many pages? It's 20 pages. And it's for a $22 million purchase? Right. Approximately. You heard Mr. Friedman's argument about 10F3, which reads, The buyer will not be obligated to consummate the transaction unless and until the buyer has determined its eligibility to receive tax credits for the premises. There is nothing before us that shows that that happened, but his argument, as you heard, is the paragraph should be structured as if it read, Buyers determined its eligibility to receive tax credits from the premises, and the outcome was favorable. Is that what he's arguing? And if so, why shouldn't we construe it that way? I had interpreted the language as being a favorable interpretation to Gulfview to move forward. So, in other words, you agree. Let me ask you this right here, because this is so crucial the way I think about this case. You agree that if they obtained tax credits financing and were able to sell them, they had to go through with the deal. But if they weren't able to get the tax credit financing, they did not have to go through with the deal, and they get their deposit back. I do not agree. Okay. Tell me then where I'm wrong. Eligibility. Eligibility. The 10F3 says buyer has determined its eligibility to receive tax credits. It doesn't say that buyer has been awarded tax credits. It doesn't say that IDA has determined that this project would receive tax credits. It says eligible. So the answer could be buyers determined its eligibility to receive tax credits from the premises, and the answer is no. They can't receive them. In your judgment, they still have to go through with the deal? No. If Gulfview had determined that it was not eligible to receive tax credits, then it would not have to go through with the purchase. What about the recital provision that says? Well, why is that? You don't have to go through with the purchase, but what about the down payment? Well, then you get to the other language under 10F3 saying that if any of the above requirements to closing are not satisfied as of closing, this agreement shall automatically terminate on the date earnest money together with all interest earned shall be refunded to buyer. That's what the contract says. So I think that if Gulfview had actually made a determination that it was not eligible to receive the tax credits, then the provisions of 10F3 would allow it to terminate the contract and wouldn't have to close. Well, I thought your position all along was 10F3 just referred to determining its eligibility, notwithstanding what the answer to the eligibility question was. You now seem to be arguing, if I understand you correctly, that Mr. Friedman is right, that if the answer is not favorable, then the deal doesn't have to go through. Where's my misunderstanding? Well, I think that you are correct. I am saying my interpretation of the contract had been that there needed to be a favorable determination of eligibility. You may interpret the contract in no way. Well, I'm not arguing your case, counsel. It seems to me that it's a little awkward for me to be taking a stronger position in this regard than you are. What's the story? I'm being honest with the court, Your Honor. I'm up here as an attorney. I'm trying to be honest with the court. But this was an affirmative defense by Gulfview. Gulfview had to present some evidence at the hearing on the motion for summary judgment to show that it had made this determination of eligibility and then found that it was not eligible. But you didn't make a showing to begin with that they had made a determination and under the contract they had to close. So I don't understand it. You're the movement on the summary judgment motion. I am on it, yes. And you have to submit sufficient evidence to show there's no question of fact that this contract should be enforced. That is true because under the language of the deposit, if you look at paragraph five, it says they put the $230,000 into escrow. And if they don't terminate, if Gulfview does not terminate within the 30-day due diligence period, and if they do not terminate because of the survey issues, and if they even so are not able to obtain financing, even so the $230,000 placed in the escrow is then paid over to RRR. So RRR is to receive the $230,000 even if the property doesn't close, subject to paragraph 10F3, where it says that if there's a determination made by Gulfview that it is not eligible to receive the tax credits, then they get the return of the earnest money. What about this? In the recitals, it says that both parties understand the buyer's looking at tax exempt bonds and tax exempt bond credit enhancement financing provided by either or the CitiBrand tool basically. That's in the recital clause. And then in paragraph three it says, when it talks about closing, it says that the seller shall have complied with all of its obligations and the buyer has not otherwise terminated the contract, and the buyer obtains the financing and or government approval set forth in this contract, then the purchase and sale shall close. I thought it was undisputed in the trial court that the buyer did not obtain the government financing. That's true, it did not. But if you look in paragraph five on the deposit, after the expiration of the due diligence review and the review period for the survey without termination by the buyer, $230,000 of the deposit shall be nonrefundable to buyer except in the event of seller's default. So that even if they didn't get the financing for the $22 million, they have still given up on the $230,000 that was put into the escrow. That $230,000 then gets paid to RRR. Where is that? Even though the parties set forth their intent that the buyer's deal is based on its getting tax exempt financing. And that it doesn't have to close if he doesn't. You're saying even though he didn't have to close, he had to forfeit his deposit. Yes. Where is that provision contained? Well, it's in paragraph five of the contract. Let me see if we can find the record for the court. Did buyer ever give any notice that it had not determined its eligibility to receive tax credits? No. It's C-17 in the record. Top paragraph, middle. See, I would think most of these deals, if you're looking for tax credit financing, there's this very complicated process you're both reporting to Mr. Friedman. And somewhere along the way you may be determined you're not eligible. You may get to the end of the process, you're eligible, but you don't get the tax credits. I would think most of these buyers ordinarily would sign a contract that says if we don't get the tax credits, we're not closing on the deal and you have to give us our deposit back. That's not the way this was written. The $230,000 becomes nonrefundable after the due diligence review period. That's under 5A? That's correct, Your Honor. But unless 10F3 gets them out. Unless 10F3 gets them out. That's their only way out is 10F3? That's their only way out. You don't think 3 or the recitals helps them? No. The trial court said there was no conflict between those provisions, between paragraph 3, the recitals, and 10F3. I think what the trial court was saying was that you can have a situation where the buyer, Gulfview, does not obtain the tax-exempt bond financing. So they don't have the money to pay the $22 million. And in that case, they don't have to purchase the property. They merely give up the earnest money of $230,000. However, when you look at paragraph 10F3, where it says the determination of eligibility, once they determine that they are eligible, then they have to close whether or not they've got the tax-exempt bond financing. What evidence was there before the trial court that showed there was a determination of eligibility for tax credit financing? Well, number one, I think that the burden was on Gulfview to prove that they had made the determination. And they didn't do that. There was nothing significant. Why is that burden on them when you're moving for summary judgment? Because it was their affirmative defense. But you have to show that all of the terms of the contract have been satisfied. I have to show that my performance has been satisfied as the seller of the property. 10F3 was a performance strictly on the part of Gulfview. It was solely within Gulfview's purview to make the determination that they were eligible. And I think that they made that determination when they submitted the performer to the appraiser and said, prepare an appraisal based upon our determination that this project is going to be eligible or is eligible and would receive tax credit financing. And I think that it was that appraisal that was persuasive to the trial court in seeing that there was a sale that was being negotiated by Gulfview of that $9 million in tax credits. So your position is that they lose their deposit because they weren't able to carry through with the rest of the deal? They weren't able to close? That's correct. And 10F3 doesn't make any difference? I think that 10F3 they failed to show to the trial court to create a genuation of material fact that they had or had not determined the eligibility of this project. Okay, now Lane's affidavit says they were unable to obtain financing. Meaning? The tax credit enhancement financing that's referred to in the recitals. Doesn't he say that? Yes. So is it your position that those things in the recitals, the bond enhancement financing and the tax credit financing are different than the tax credits referred to in 10F3? Absolutely. So the tax credit is a means by which they are able to raise cash at the beginning of the project where they take the real estate taxes that would be otherwise assessed against the property and are able to then sell that to a buyer and then the buyer is able to use that as a credit against his own real estate taxes and there's a market for that. But that's different than going out and borrowing money. They sell the tax credits, they take the cash in and they use that for development. So when Lane says that they were not able to obtain the tax credit financing, that does not mean they were not eligible for the tax credit financing. There's a limited amount of tax credit financing that's determined by the IRS that's spread across the country. You don't know how much is going to be allocated to each state. Each state makes its own allocation of what that amount is going to be to various eligible applicants. Not all the applicants are going to get the tax credit. What I'm asking here is this. In the recitals it says, seller understands buyer intends to finance the acquisition by the use of tax-exempt bonds issued by IDA or the Citi Grant Tool and tax-exempt bond credit enhancement financing. So there are two things, tax-exempt bonds issued by IDA and tax-exempt bond credit enhancement financing. Are those two things physically different than the tax credits referred to in 10-F-3? My understanding is yes, they are different. And tax credit enhancement financing is different from tax credits. I guess one thing I'd like you to answer, Mr. Takas, is we seem to have a lot of questions about the contract and what it means. Usually when you get a case on summary judgment, it's clear as a bell. Somebody's entitled to judgment. Summary judgment is disfavored. I mean, if we've got all these questions, why wouldn't it have been helpful for the trial court to have an evidentiary hearing where you brought in your experts who testified what you meant when this contract was drafted and they could bring in their expert to testify what they meant if it's ambiguous? I don't know, Your Honor. Thank you, Counsel. Your time is up. Thank you, Your Honor. Mr. Friedman, you may have rebuttal if you wish. Thank you, Your Honor. I have nothing to add to my arguments in the brief and the oral argument previously. Well, I have this question. I'm still trying to wrestle with it, Mr. Friedman. If a condition preceded or your client engulfed you to make this purchase was that they have to be able to get tax credits, this financing that we talked about, and that they have to have it favorable, it's hard for me to understand how in a $22 million deal and a 20- or 30-page contract that isn't set up front. And if it's not set up front, why should we read it anyway? Well, it seems to me 10F3 does say it pretty explicitly, and it says the contract automatically terminates. To answer one of the justices' questions, there is no notice requirement. It is in the judgment of the purchaser, and it automatically closes it, terminates the closing, and that's what the 10F3 says. Do you agree with the fact that there's a difference between terminating closing and getting your deposit back? Yes, and we've argued that in our brief. We've set out why that $230,000 remained in escrow even after the due diligence period closed. It was there to ensure the closing if all the conditions were satisfied, yes. So why do you get your $230,000 back? Because that was there to ensure against a default if it occurred. And if there was a default, obviously, RRR was entitled to it. If there was no default and it did not close in accordance with the conditions in the contract, then it would come back. So it remained as any earnest money or deposit does. It remains to ensure performance if all the conditions are complied with. It sounds like under your argument, you have the absolute power to destroy the deal at any time. All you do is say, well, we haven't determined our eligibility. Your Honor, if that's the case, that's what the parties agreed to in 10F3. That's what they agreed to? That you had the absolute power to terminate the contract and get your money back? We had the absolute judgment to determine, or I guess reasonable judgment, that those $9 million of tax credits were not going to be available to us. We were not eligible to receive them. He never gave any notice. That's correct, Your Honor. If he didn't give notice, no notice was required. So all you have to do is say, well, we don't think we're eligible. Give us our $230,000. That is correct. One other thing. The parties agreed to that. Wait a minute. The parties agreed to that?  Paragraph 5. It says after your 30-day due diligence period, the $230,000 is locked in. Yes. If at the end of the due diligence, if we found that there was a problem, at that point the S&A contract, the earnest money would come back. If due diligence period passed, which it did, that $230,000 remains as security for the performance. Yes. Is there any reason why Mr. Lane, who is the one fellow whose affidavit you submitted, if, in fact, you had not determined, well, if you had not determined his eligibility to receive tax credits for the premises, couldn't have said that in his simple declarative sentence? And the fact that he didn't, doesn't that establish that there was no genuine issue of material fact in that question? No, I think there wouldn't be a need for an appellate court if lawyers documented every item of the contract as they should. Well, this is the motion for summary judgment. In response, to create a genuine issue of material fact with regard to your affirmative defense. Hey, we've got this affirmative defense here. Wouldn't it, all he has to say is, the buyer has not determined its eligibility to receive tax credits for the premises, and we'd be off to a trial, wouldn't we? Well, I have to say that the answer that Goldfield filed did raise that issue, in the answer itself, apart from the affirmative defense. Yes, I certainly would have rather he said that, but this is what the affidavit says, and we need to address the exact language. Okay, thank you, counsel. Thank you, Samantha, for your advice and being resourceful.